**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| **MEMPHIS LIGHT, GAS AND WATER DIVISION,** ) ) ) | |
| **Plaintiff,** ) | |
| ) | **Case No. _____** |
| **v.** ) | |
| ) | |
| **ASPLUNDH TREE EXPERT, LLC,** ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT FOR BREACH OF CONTRACT AND MISREPRESENTATIONS

COMES NOW Plaintiff, Memphis Light, Gas and Water Division of the City of Memphis, Tennessee, by and through counsel, and for its complaint against Defendant, Asplundh Tree Expert, LLC, alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Memphis Light, Gas and Water Division ("MLGW" or "Plaintiff") is a Tennessee public utility created as a division of the City of Memphis. MLGW maintains its principal place of business at 220 South Main Street, Memphis, Tennessee 38103.

2.      Asplundh Tree Expert, LLC ("Asplundh" or "Defendant"), is a limited liability company organized under the laws of the State of Pennsylvania. Asplundh maintains its principal office at 708 Blair Mill Road, Willow Grove, Pennsylvania 19090, and may be served through its registered agent, Corporation Service Company, at 2908 Poston Avenue, Nashville, Tennessee 37203.

3.      Plaintiff and Defendant were parties to a $97,419,024.24 contract titled "Line Clearance," contract number 12077 (the "Contract"), effective August 30, 2019, and terminated by Plaintiff for cause on July 13, 2023. The entire contractual agreement consisted of Defendant's bid, contract, general conditions, and specifications, all of which were bound together. A complete copy of the Contract is attached as **Exhibit A** and is incorporated as if fully set forth herein.

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between the parties and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in Shelby County, Tennessee.

6.      Defendant is subject to this Court's personal jurisdiction as this action arises from the Contract at issue which provides for services to be rendered in Tennessee, as set forth herein.

### FACTS

7.      Among other things, MLGW owns, controls, and manages the electric power distribution system that supplies electric power and energy to individuals and businesses located within Shelby County, Tennessee.

8.      A significant part of maintaining and improving MLGW's electric distribution system is its vegetation management program, which is one of the largest expenditures for MLGW's electric division.

9.      The purpose of the vegetation management program is to maintain an appropriate clearance and reduce tree-related power outages and electrical hazards. To accomplish this, trees and other vegetation that are in close proximity to overhead electrical lines are meant to be trimmed on a "cycle" schedule.

10.     Due to the public's interest in and importance of maintaining its electric distribution system, which is an essential service, MLGW outsources its vegetation management work to third-party contractors who specialize in utility line clearance.

### Asplundh's Misrepresentations

11.     Line clearance contractors are chosen through a competitive bidding process. Prospective bidders receive a copy of the proposed contract, specifications, and forms for bidders to use to provide pricing and other requested information. The contract is awarded based on the bid amount as well as other considerations such as experience, supplier diversity, specification compliance, and ability to complete the work as required by MLGW.

12.     In or around early 2019, MLGW put out a request for bids on a new contract for vegetation management. MLGW was in search of a contractor to perform the preventative maintenance trimming of trees on a 3-year cycle, also referred to as "cycle trimming." The contractor would also perform other types of work on an as-needed basis, such as remedial trimming and emergency clearance.

13.     The bid materials that MLGW provided to prospective bidders, including Asplundh, contained all material information related to the scope and performance of the work.

14.     Asplundh submitted a bid to MLGW on or about March 19, 2019.

15.     Asplundh holds itself out as "a leading provider of safe, cost-effective, and environmentally sustainable vegetation management and utility infrastructure services" that include, among other services, "tree pruning and removals, right-of-way clearing and maintenance, vegetation management with herbicides, emergency storm work and logistical support." Delivering Comprehensive Services, https://asplundh.com/ (last visited May 2, 2024), attached as **Exhibit B**.

3

16.     Asplundh's website makes the following claims: "As full-service utility partner, Asplundh brings experienced personnel, specialized equipment, innovative technology, and logistical resources to execute successful vegetation management programs. From simple to complex, we handle a range of job requirements, including tree pruning and removals, right-of-way clearing and maintenance, herbicide application, emergency storm work and logistical support. Regardless of the job size and scope, the Asplundh team can do it more safely, efficiently, and effectively, and at a lower cost." Vegetation Management, https://asplundh.com/vegetation-management/ (last visited May 2, 2024), attached as **Exhibit C.**

17.     When submitting its bid, Asplundh represented to MLGW that it had "carefully examined" the bid request documents provided by MLGW, which included the proposed form of contract, other contract documents, and the specifications. (*See* Ex. A, Bid, at BB-1.)

18.     Asplundh also represented to MLGW that it had "made such investigations as are necessary to inform the bidder in all matters affecting the performance of the contract bid upon." (Ex. A, Bid, at BB-1.)

19.     As Asplundh represented it had reviewed all of the bid request documents, Asplundh also was aware, or should have been aware, when preparing and submitting its bid that Asplundh was obligated to "fully understand the facilities, difficulties and restrictions attending and execution of the work required." (Ex. A, Contract, at C-4.)

20.     Asplundh further represented at the time of submitting its bid that it would agree to be contractually bound to perform the work in a good and skillful manner and at the bid prices it submitted. (*See* Ex. A, Bid, at BB-1.)

21.     Via a letter dated March 15, 2019, Asplundh provided MLGW with Asplundh's staffing plan, which it represented would achieve the completion of a 3-year cycle trim of the trees

on the entirety of MLGW's electric distribution system. As part of that staffing plan, it stated that by the 180th day of beginning the work, Asplundh would have 95% of the necessary staffing to perform the work, or around 190 employees.

22.     Asplundh was awarded the contract through MLGW's competitive bidding process, not only on the basis of Asplundh's bid pricing, but also based on Asplundh's experience, size, and stated ability to complete the work as specified by MLGW.

### The Contract at Issue

23.     On August 30, 2019, MLGW and Asplundh entered into the five-year Line Clearance Contract, comprised of Asplundh's bid, contract, general conditions, and specifications, all of which together constituted the complete set of specifications for the work. (*See* Ex. A. Contract, art. IX, at C-7.)

24.     The Contract required Asplundh to perform the following "Work":

> [F]urnish supervision, labor, transportation, equipment and such material including equipment, tools, and supplies as required to trim and or remove all trees and brush. Also, to trim trees using the most arboricultural techniques, and perform other utility forestry services including chemical spraying, transmission right of way clearing and mowing, clean up and disposal of materials, and to provide clearance for the electric conductors of MLGW. In addition, this contract may include emergency storm work.

(Ex. A, Contract, art. III, at C-4.)

25.     The Contract specified that as part of the scope of Work, Asplundh was required to trim MLGW's entire electric distribution system on a 3-year cycle. (*See* Ex. A, Specifications, para. 2, at SPEC-2.)

26.     That cycle trimming obligation, *i.e.*, to clear the lines of the entirety of MLGW's distribution system every three years, was the core obligation of the Contract. Trimming vegetation

at regular intervals is crucial to reduce the risk of tree-related outages and other damage to the electric distribution system.

27.     The Contract provided specific metrics for the cycle trimming obligation, in terms of mileage. As set out in the Contract, the entire distribution system totaled 4,119 miles. As such, to completely perform its obligation to trim the entire system on a 3-year cycle, Asplundh had to trim 1,400 miles each year, or approximately one-third of MLGW's electric distribution system annually. Over the five-year term of the Contract, Asplundh was required to trim a total of 7,000 miles. (*See* Ex. A, Specifications, para. 2, at SPEC-2; *see also* Bid, at BB-3.1 to -3.11.)

28.     The Contract provided MLGW with the right to control and assign the sequence of the cycle trimming work to be performed by Asplundh. (*See* Ex. A, Contract, art. III, at C-4, art. IX, at C-7; Gen. Conditions, para. 26, at GC-10; Specifications, para. 8, at SPEC-7.)

29.     Asplundh was obligated to complete the Work in accordance with the design as decided and determined by MLGW. (*See* Ex. A, Contract, art. IX, at C-7.)

30.     Asplundh was also obligated to perform the Work under the Contract in a timely manner, time being of the essence:

> The Work under this Contract will be performed in its entirety during the allocated time for the Work.

(Ex. A, Contract, art. III, at C-4.)

> The Contractor agrees to complete each portion of the Work by the date specified in Contract Documents or by MLGW, with time being of the essence. The Work shall begin in a timely manner and be continued through completion during normal working hours unless otherwise specified by the MLGW representative.

(Ex. A, Contract, art. XXIV, at C-19 to -20; *see also* Gen. Conditions, para. 15, at GC-7.)

31.     Asplundh was solely responsible for providing and training the personnel to complete the Work under the Contract in a timely manner:

The Contractor will furnish the personnel that shall be required to complete the Work in a timely manner and within the Contract amount. The Contractor, at the Contractor's sole cost and expense, will train employees prior to the start of the Work.

(Ex. A, Contract, art. XII, at C-7, art. XXVI, at C-20.)

The Contractor shall maintain and operate a workforce sufficient to meet the requirements of this provision.

(Ex. A, Contract, art. XXIV, at C-19 to -20; *see also* Gen. Conditions, para. 15, at GC-7.)

32.     Payment for the cycle trimming portion of the Work was based on units, which were miles. The pricing for each mile was based on and set by Asplundh's bid, and the price-per-mile varied depending on the year, the geographical area, the type of electrical lines, and the location of the lines (front lots or roadways versus rear or back lots). (*See* Ex. A, Specifications, para. 2, at SPEC-2; *see also* Bid, at BB-3.1 to -3.11.)

33.     The Contract's total value was $97,419,024.24, which was the amount of Asplundh's bid. Of that total amount, $74,521,917.45 was for the cycle trimming. These amounts are further broken out by year as follows:

|  | Total Contract Amount | Portion of Contract Amount for Cycle Trimming |
|---|---|---|
| Year 1 | $18,547,505.26 | $14,177,560.86 |
| Year 2 | $19,005,934.87 | $14,531,999.89 |
| Year 3 | $19,475,720.06 | $14,895,299.88 |
| Year 4 | $19,957,142.62 | $15,267,682.38 |
| Year 5 | $20,432,721.43 | $15,649,374.44 |
| **TOTAL** | **$97,419,024.24** | **$74,521,917.45** |

(*See* Ex. A, Bid, at BB-3.1 to -3.11.)

34.     At all times during the bidding process and when the Contract was in effect, Asplundh was well-informed of all material information related to the scope and performance of Work because the material information was included in the bid request documents provided to Asplundh prior to entering into the Contract. The material information included, but was not

limited to, the 3-year cycle trimming requirements, Asplundh's obligation to provide the necessary work force, and Asplundh's obligation to complete the Work as assigned, scheduled, and directed by MLGW.

**Asplundh's Failure to Perform its Obligations and its Additional Misrepresentations**

35.    Asplundh began performing the Work in October 2019.

36.    Asplundh's performance was deficient from the beginning of the Contract term. In fact, in 2020, Asplundh only cycle trimmed 610 of the 1,400 required miles, and the number of miles trimmed each year by Asplundh thereafter dropped.

37.    MLGW's electric distribution system is mapped on a grid system that is divided into 139 sections. Each section is then further divided into 28 blocks. MLGW assigned the cycle trimming by section, and Asplundh had discretion on the order it worked the blocks within each assigned section.

38.    MLGW was not obligated to pay Asplundh for cycle trimming mileage on a section block until Asplundh completed the entirety of the block.

39.    Asplundh's materially deficient performance resulted in many sections being behind schedule on cycle trimming. This was particularly an issue in sections with older, more mature trees, as the failure to maintain the proper cycle trimming schedule resulted in higher risk of tree-related outages.

40.    As such, MLGW's section assignment priorities were focused on those sections with older, more mature trees that were behind on cycle trimming and thus presented higher risk of tree-related outages.

41.    The purpose of MLGW's assignment of sections and its policy requiring an entire block to be completed before payment for the mileage on that block was to maintain the integrity

of the electric distribution system through consistently well-maintained vegetation. If the trimming of an entire block is not completed in a timely manner, it negatively impacts the reliability of the electric distribution system and causes MLGW's customers to experience more service outages.

42.     Asplundh did not perform the cycle trimming in a timely manner and did not make sufficient progress on the assigned sections that would have resulted in it performing the entirety of the cycle trimming required under the Contract.

43.     Asplundh also failed to hire, train, and maintain a sufficient workforce to timely complete the cycle trimming that was assigned by MLGW, despite its obligation to do so and despite its own representations both during the bidding process and later that it would provide enough employees to achieve the 3-year cycle trimming.

44.     The average number of Asplundh's crews dropped each year between 2020 and 2023, and the number of crews was never sufficient to complete the cycle trimming assignments in a timely manner.

45.     In addition to failing to hire and maintain the number of employees it had represented it would provide to perform the Work, Asplundh also made personnel decisions that delayed the cycle trimming.

46.     At times, Asplundh pulled its crews from the MLGW service area and moved them to jobs in other states, where upon information and belief, Asplundh knew it was able to profit more than it would profit under the bid prices it submitted for the Contract.

47.     Asplundh's management of its crews that performed cycle trimming also contributed to its failure to perform under the Contract.

48.     The trees on the front lines were primarily trimmed by "bucket crews" and the trees on the rear lines were primarily trimmed by "manual crews" that manually climbed trees for

trimming. It is crucial that bucket crews do not work more than a few weeks ahead of manual crews, so that there is consistent and well-maintained clearance of all electrical lines on both front and rear lines in a block to minimize tree-related power outages and electric hazards on that block.

49.     Instead of following MLGW's directives and policies to complete all portions of a block in a timely manner, Asplundh concentrated its efforts on easier and more financially lucrative trimming of front lines by bucket crews, and neglected the areas that required manual crews to trim the overgrowth of vegetation.

50.     Asplundh did not assign enough of its employees to the crews that were necessary to complete the manual work, or rear lot, tree trimming required of it per MLGW's assignments. Asplundh allowed its bucket crews on the front lines to work significantly faster than its manual crews that were to trim the rear electrical lines. As a result, the rear electrical lines were even further behind schedule for cycle trimming than front lines and section blocks were not completed in a timely manner.

51.     Asplundh's actions in failing to complete the necessary climbing work resulted in slower production and progress on the cycle trimming work.

52.     MLGW's ability to assign additional sections that were in need of cycle trimming was significantly impeded by Asplundh's failure to complete all required miles in assigned sections (both front and rear lines).

53.     After the Contract was entered into, Asplundh made other representations to MLGW regarding Asplundh's ability to complete the Work specified in the Contract, representations which MLGW relied on as MLGW had placed its trust and confidence in Asplundh's expertise in vegetation management for essential utility services.

54.     In or around August 2020, through conversations and an August 18, 2020 letter, Asplundh requested that MLGW approve the use of certain specialized equipment that Asplundh did not originally include in its bid. Asplundh represented that if MLGW would approve rates for the specialized equipment, the new equipment could provide solutions to achieve MLGW's tree trimming needs. MLGW relied on that representation and approved the rates for the additional specialized equipment.

55.     In early 2021, Asplundh again made representations to MLGW regarding Asplundh's staffing of employees to perform the cycle trimming. Specifically, through its employees, Asplundh made representations in person and in writing, including a February 25, 2021 letter to MLGW, requesting that MLGW pay a per diem rate to assist Asplundh with expenses of hiring employees. Asplundh represented that the per diem rate would help it expand its workforce and increase cycle trimming mileage. Asplundh repeated the representations and request in an April 22, 2021 letter. Relying on the representations, MLGW approved a per diem rate.

56.     Those representations and promises were false, as Asplundh did not increase the mileage or hire enough employees to perform the cycle trimming in a timely manner. Nor did Asplundh intend to carry out the representations and promises at the time made, as it continued to make personnel decisions and crew management decisions that did not increase the workforce and instead contributed to its failure to provide a sufficient workforce and failure to complete the cycle trimming in a timely manner.

57.     Asplundh knew, or made the representations recklessly without regard to whether they were true or false, that it was not going to increase the mileage or hire enough employees, but upon information and belief made the false representations and promises in an effort to keep performing non-cycle trimming work for MLGW that was more profitable to Asplundh.

58.     In reliance on Asplundh's representations, MLGW continued to assign trimming to Asplundh to MLGW's detriment, as the cycle trimming fell even further behind schedule.

59.     In late 2022, MLGW assigned section 86 to Asplundh, but Asplundh had failed to complete that section by the summer of 2023.

60.     Asplundh failed to comply with its contractual obligations because it did not perform the cycle trimming in a timely manner to meet the required miles under the Contract and ultimately failed to make sufficient progress to perform a 3-year cycle trim of MLGW's entire electric distribution system.

61.     Asplundh's trimming of assigned sections was completed at a deficient rate that would not achieve the required 3-year cycle trim of the entire system.

62.     During the term of the Contract, Asplundh never came close to trimming the 1,400 miles required each year to maintain a 3-year cycle. Its progress declined each year, starting with 610 miles trimmed in 2020, 552 miles trimmed in 2021, 190 miles trimmed in 2022, and only 26 miles trimmed in 2023 prior to MLGW's termination of the Contract for breach on July 13, 2023.

63.     By the end of 2022, Asplundh had only trimmed 1,367 miles total during the three full years into the Contract term, less than the annual requirement. That total mileage was woefully deficient and did not even come close to completing the entire 4,119 mile distribution system over that 3-year period.

64.     Asplundh's actions and its failures negatively impacted the reliability of the electric system and caused MLGW's customers to experience increased rates of power outages, which negatively impacted MLGW's reputation and goodwill in the community and among its customers because the public mistakenly attributed the reliability issues to MLGW instead of Asplundh.

**Termination of the Contract**

65.     The Contract provided MLGW with the right to terminate the Contract, without any prior written notice, for any of the reasons set out in the Contract's breach of contract provision. (*See* Ex. A, Contract, art. V, at C-5.)

66.     More specifically, the breach of contract provision provided that MLGW could terminate the Contract should Asplundh:

1.   Fail or refuse to perform the Work in whole or in part after notice by MLGW to proceed;

2.   Abandon the Work;

…

5.   Unnecessarily or unreasonably delay the Work at any time;

6.   Willfully or negligently violate any provisions of this Contract;

7.   Fail or refuse to fully complete the Work within the time specified or extension of time granted by MLGW;

…

9.   Make material misstatements on any documents submitted with the bid or after award of contract;

…

11.  Fail or refuse to comply with the terms and provisions of the Contract and or Contract Documents;

12.  Fail to complete the work within the specified time allotted for completion of Work as set forth in the proposal and otherwise as set forth in the Contract Documents.

(Ex. A, Contract, art. XVII, at C-13 to -14.)

67.     Although not required to under the terms of the Contract, MLGW provided Asplundh with advance written notice of Asplundh's breaches, including notice provided as late as May 30, 2023.

68.     Asplundh did not increase its production rate, did not hire more employees, and did not increase the number of its crews, or otherwise cure its breaches.

69.     On July 13, 2023, MLGW provided formal written notice to Asplundh that the Contract was immediately terminated.

70.     At the time the Contract was terminated, Asplundh had only trimmed 1,393 miles total for the cycle trimming.

71.     Asplundh failed to trim 5,607 miles of the total miles required under the Contract.

72.     As a result of Asplundh's failure to perform its cycle trimming obligations under the Contract, the vegetation on the electric distribution system became overgrown, resulting in additional and more expensive tree trimming to properly clear the overgrowth. The overgrowth also caused a decrease in electrical service reliability that directly impacted MLGW's customers, as well as increased MLGW's costs and expenses to restore electric service.

73.     In the event of a termination of the Contract, Asplundh is liable for all expenses or financial losses incurred by MLGW for completing the Work under the Contract. (*See* Ex. A, Contract, art. V, at C-5.)

74.     The Contract provided MLGW with the right to hire other contractors to complete the Work required by the Contract. (*See* Ex. A, Contract, art. V, at C-5.)

75.     Through a competitive bidding process, in August 2023 MLGW entered into 5-year contracts with three (3) new contractors to complete the Work that Asplundh was obligated to perform under the Contract. It was necessary that MLGW enter into the new contracts in a timely manner to minimize the gap in cycle trimming in an effort to reduce the severity and number of power outages MLGW's customers were experiencing due to Asplundh's failure to perform under the Contract.

76.     The three new contracts each cover cycle trimming for separate specific areas of the electric distribution system, and together those areas represent the same total area and total mileage that was covered by the Asplundh Contract.

77.     MLGW assigns the cycle trimming to the new contractors on a grid basis, by sections and blocks, just as it assigned the cycle trimming to Asplundh. Currently, the new contractors have made sufficient progress on the assigned cycle trimming to complete the required 1/3 of the mileage of the total system in the first year. This is the same one-year mileage requirement Asplundh had under the Contract, but failed to come even close to completing.

### Damages Caused by Asplundh

78.     MLGW has been damaged by Asplundh's breaches of the Contract and its false statements and promises in that MLGW is incurring and will continue to incur higher costs under the new contracts to complete the cycle trimming that Asplundh did not perform.

79.     Whereas Asplundh's Contract had a total 5-year value of just over $97 million for all of the tree trimming work (both cycle and non-cycle trimming), the three new contracts' 5-year total is over $227 million for both cycle and non-cycle trimming,

80.     The unit or mileage bid pricing for just the cycle trimming portion under the new contracts greatly exceeds the per mile pricing under Asplundh's Contract, resulting in cycle trimming cost bids that are at least double what MLGW would have paid per mile pursuant to the Asplundh Contract. For example, the first year of the new contracts is basically the same time period as the last year of the Asplundh Contract, had it not been terminated. For that time period of fall 2023 to fall 2024, the three new contracts' cycle trimming bids total $31,990,445 for that one-year period alone, which is twice the amount of Asplundh's contractual obligation to perform the same cycle trimming in the amount of $15,649,374 for that same time period. As such, in the

first year alone, the loss incurred or to be incurred by MLGW for the additional costs of the new contracts is over $16 million.

81.     That increase in cycle trimming costs for the first year of the new contracts represents an average *additional* per mile cost to MLGW of $11,672 to complete the mileage Asplundh failed to cycle trim per its contractual obligation.

82.     Asplundh's failure to provide the necessary work force and to perform the cycle trimming in a timely manner was a cause of higher cycle-trimming costs under the new contracts because of the necessary additional work to properly clear the electrical lines of the vegetation overgrowth and dispose of additional debris until the required cycle is reestablished.

83.     Asplundh's breaches and false statements and promises also caused MLGW's electric distribution system to become overgrown with vegetation because of the delay in cycle trimming, resulting in the system suffering decreased reliability and MLGW's customers to experience increased rates of tree-related outages. MLGW's reputation and goodwill in the community and among its customers has also been negatively impacted due to Asplundh's breaches and other wrongful acts.

84.     As a result, MLGW has incurred and will continue to incur increased expenses and costs for remedial trimming necessitated by the overgrowth of vegetation on the electric distribution system.

85.     MLGW conducts line inspections and issues work orders for remedial trimming in areas that are more at risk for tree-related outages. Remedial trimming is a supplement to cycle trimming and is performed on an as-needed basis.

86.     The need for such remedial trimming has increased as a result of Asplundh's failure to stay on schedule and perform the cycle trimming in a timely manner. The additional remedial

trimming that is attributable to Asplundh's breaches is expected to continue for several years until the overgrowth of vegetation has been addressed and the cycle trimming has been reestablished.

87.     Further, Asplundh's breaches and actions described herein have caused MLGW to incur and likely continue to incur increased expenses and costs for restoring power after storms and weather events as a result of the vegetation overgrowth, including but not limited to emergency tree trimming costs and emergency clearance costs.

88.     Asplundh's failure to timely perform cycle trimming has resulted in more frequent service interruptions than would occur if trees were well-maintained on a 3-year cycle. The increased emergency restoration expenses attributable to Asplundh's breaches are expected to continue until the vegetation overgrowth has been addressed through timely cycle trimming.

89.     MLGW does not owe any payments to Asplundh because any unpaid invoices submitted by Asplundh were for cycle trimming of uncompleted blocks, thus, those amounts are not due pursuant to the terms of the Contract.

90.     Because the expenses and financial losses incurred by MLGW exceed what would have been payable to Asplundh had it completed its obligations, Asplundh is obligated to pay the excess to MLGW and such payment must be made "promptly." (*See* Ex. A, Contract, art. V, at C-5, art. XVII, at C-14.)

91.     To date, no payment has been made to MLGW. Accordingly, MLGW is entitled to recover the costs of collecting payment, including attorney fees, plus interest at the maximum rate allowed by law. (*See* Ex. A, Contract, art. XVII, at C-14.)

## CAUSES OF ACTION

### Count One – Breach of Contract

92.     MLGW adopts and incorporates herein paragraphs 1 through 91 above by reference to the extent consistent with this cause of action.

93.     The Contract is a valid and binding contract between MLGW and Asplundh.

94.     MLGW has fully complied with its obligations under the Contract.

95.     Asplundh has failed to comply with its obligations under the Contract.

96.     Under the Contract, Asplundh had a contractual duty to trim the entirety of MLGW's electric distribution system on a 3-year cycle. It further had the contractual duty to provide and maintain an adequate workforce to complete the cycle trimming in a timely manner.

97.     Asplundh breached the Contract in that it failed to trim the mileage required under the Contract's terms and failed to complete the trimming of MLGW's entire electric distribution system in a 3-year period.

98.     Asplundh breached the Contract in that it failed to make sufficient progress on cycle trimming assignments and as a result, it unnecessarily or unreasonably delayed the progress of the required 3-year cycle trimming.

99.     Asplundh breached the Contract by failing to complete the Work as assigned, scheduled, and directed by MLGW.

100.    Asplundh breached the Contract in that its failure to make sufficient progress made it impossible for it to complete the entirety of the Contract within the five-year term.

101.    Asplundh breached the Contract in that it failed to provide, train, and maintain sufficient personnel to complete the cycle trimming work in a timely manner and within the Contract amount.

102.    Asplundh is also contractually obligated to make prompt payment to MLGW for the expenses and financial loss to MLGW for completing the cycle trimming work to the extent such expenses and financial loss exceeds the amount payable under the Contract had Asplundh completed the cycle trimming work.

103.    Asplundh has breached the Contract by refusing to pay MLGW for the expenses and financial loss MLGW has incurred or will incur to complete the work that Asplundh was obligated to complete, as such expenses and financial loss exceed the amounts that would have been due under the Contract if Asplundh had completed its obligations.

104.    Asplundh has breached the Contract by making material misrepresentations in its bid and again after the Contract was entered into regarding its work force and ability to perform the cycle trimming in a timely manner.

105.    Asplundh has further breached its implied duty of good faith and fair dealing, and/or to perform the cycle trimming work with care, skill, and diligence.

106.    As the Contract specified that time was of the essence and the cycle trimming was the core obligation of the Contract, Asplundh's failures to perform its contractual obligations were material breaches of the Contract.

107.    MLGW has been damaged as a result of Asplundh's breaches as set forth in herein.

108.    As a direct and proximate result of Asplundh's breaches, MLGW has and will continue to incur expenses and financial losses through increased costs in completing the Contract, increased costs of remedial trimming, and increased costs for storm and emergency restoration efforts in an amount to be determined at trial.

109.     As a direct and proximate result of Asplundh's breaches, MLGW has further incurred costs of collection, including attorney fees, and is entitled to interest on the amounts due as a result of Asplundh's breaches of the Contract.

### Count Two – Negligent Misrepresentation

110.     MLGW adopts and incorporates herein paragraphs 1 through 109 above by reference to the extent consistent with this cause of action.

111.     Asplundh was acting in the course of its business when it submitted its bid and other information to MLGW that were meant to guide MLGW in selecting a contractor for its vegetation management program.

112.     Asplundh failed to exercise reasonable care in obtaining and/or communicating the bid and other material information, and as such, provided faulty or false information to MLGW that it had carefully examined the bid documents and specifications regarding its obligations to provide a sufficient work force and to trim the full electric distribution system over the course of three years as assigned, scheduled, and directed by MLGW, and further provided faulty or false information that it had conducted investigations and was informed of all matters, including any that would impact its ability to hire employees and timely complete the cycle trimming mileage requirement.

113.     Asplundh failed to exercise reasonable care in obtaining and/or communicating the information to MLGW that Asplundh had the ability and resources to hire and maintain enough employees to trim the required annual mileage for the cycle trimming as assigned and at the bid prices it submitted.

114.     Asplundh had a pecuniary interest in making the representations to MLGW so that MLGW would award Asplundh the Contract.

115.    MLGW justifiably relied upon the faulty or false information provided by Asplundh to MLGW's detriment by selecting Asplundh's bid and entering into the Contract.

116.    As a direct and proximate result of Asplundh's misrepresentations, MLGW has been damaged as described herein, and has suffered considerable financial loss in an amount to be determined at trial, including but not limited to increased costs in completing the cycle trimming, increased costs of remedial trimming, and increased costs for storm and emergency restoration efforts.

### Count Three – Intentional Misrepresentation / Fraudulent Inducement

117.    MLGW adopts and incorporates herein paragraphs 1 through 116 above by reference to the extent consistent with this cause of action.

118.    Asplundh intentionally or recklessly provided false information to MLGW by representing that Asplundh had carefully examined the bid documents and specifications regarding its obligations to provide a sufficient work force and to trim the full electric distribution system over the course of three years as assigned, scheduled, and directed by MLGW, and further representing that it had conducted investigations and was informed of all matters, including any that would impact its ability to hire employees and timely complete the cycle trimming mileage requirement.

119.    Asplundh intentionally or recklessly provided false information to MLGW by representing that Asplundh had the ability and resources to hire and maintain enough employees to trim the required annual mileage for the cycle trimming at the bid prices it submitted.

120.    Asplundh's misrepresentations concerned facts material to the business transaction between it and MLGW, and were made with the intent to induce reliance on the misrepresentations in an effort to obtain a financial benefit.

121.    Asplundh knew, or made the representations recklessly without regard to whether they were true or false, that the representations were false because it had not carefully examined the documents and specifications regarding its obligations nor conducted investigations to fully inform itself as to any matters that would affect those obligations.

122.    Asplundh knew, or made the representations recklessly without regard to whether they were true or false, that the representations were false because it did not have the ability and resources to hire and maintain enough employees to trim the required annual mileage for the cycle trimming at the bid prices it submitted.

123.    MLGW did not know Asplundh's representations were false and was justified in relying on the representations in deciding to award the Contract to Asplundh.

124.    As a direct and proximate result of Asplundh's misrepresentations, MLGW has been damaged as described herein, and has suffered considerable financial loss in an amount to be determined at trial, including but not limited to increased costs in completing the cycle trimming, increased costs of remedial trimming, and increased costs for storm and emergency restoration efforts.

**Count Four – Promissory Fraud / Fraudulent Inducement**

125.    MLGW adopts and incorporates herein paragraphs 1 through 124 above by reference to the extent consistent with this cause of action.

126.    Asplundh made material false promises to MLGW concerning the Contract, including that Asplundh would provide a sufficient work force and equipment to timely complete the cycle trimming of MLGW's electric distribution system as assigned, scheduled, and directed by MLGW, and at the bid prices submitted by Asplundh.

127.    At the time it made the promises, Asplundh knew, or had utter disregard for the truth, that it did not intend to perform as represented or promised, and instead Asplundh would direct its employees to more profitable work away from MLGW and would attempt to perform the cycle trimming work in a manner and sequence that would be more profitable to Asplundh.

128.    Asplundh made the promises with the intent to induce MLGW to rely on the promises and act or not act upon the promises by awarding the Contract to Asplundh and to continue the relationship after the Contract term had begun, in an effort to maintain its non-cycle trimming work with MLGW that was more profitable to Asplundh.

129.    MLGW did not know that Asplundh did not intend to perform as represented or promised, and justifiably relied on the false promises by awarding the Contract to Asplundh and continuing to assign Work to Asplundh.

130.    As a direct and proximate result of Asplundh's false promises, MLGW has been damaged as described herein, and has suffered considerable financial loss in an amount to be determined at trial, including but not limited to increased costs in completing the cycle trimming, increased costs of remedial trimming, and increased costs for storm and emergency restoration efforts.

**Count Five – Constructive Fraud**

131.    MLGW adopts and incorporates herein paragraphs 1 through 130 above by reference to the extent consistent with this cause of action.

132.    MLGW placed its trust and confidence in Asplundh, as an expert in vegetation management for utility infrastructure, and relied on Asplundh's representations that it had the ability to, and would, perform the Work required by the Contract.

133.    Asplundh owed a legal and/or equitable duty to MLGW to perform the cycle trimming in a timely and efficient manner to reduce the risk of tree-related power outages, and to avoid impeding MGLW's ability to provide electric power service to individuals and businesses in the Shelby County area.

134.    Asplundh breached its duty to provide the work force necessary to complete the cycle trimming in a timely manner and as assigned, scheduled, and directed by MLGW, resulting in a significant detrimental impact on the reliability of and injury to the electric power distribution system that supplies electric power and energy to the public within Shelby County, Tennessee.

135.    Asplundh's breach of its duty further caused MLGW's customers to experience increased rates of power outages and negatively impacted MLGW's reputation and goodwill in the community and among its customers.

136.    Asplundh's acts as described herein are detrimental to public interest, as the affected utility is an essential service provided to the Shelby County area.

137.    As a direct and proximate result of Asplundh's conduct, MLGW has been damaged as described herein, and has suffered considerable financial loss in an amount to be determined at trial, including but not limited to increased costs in completing the cycle trimming, increased costs of remedial trimming, and increased costs for storm and/or emergency restoration efforts.

### PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff MLGW prays that:

A.  Proper process be issued and served upon Defendant, requiring it to answer hereto;

B.  This case be tried before a jury;

C.  Judgment be entered in Plaintiff's favor against Defendant for compensatory damages in an amount to be proven at trial, plus punitive damages and any consequential, incidental, and such other damages as which may be proven;

D.  Plaintiff be awarded prejudgment and post-judgment interest;

E.  Plaintiff be awarded its reasonable attorney fees, costs, and expenses;

F.  The court costs in this cause be assessed against Defendant; and

G.  For any and all other relief to which Plaintiff may be entitled, including, but not limited to the right to amend this Complaint.

Respectfully submitted,

BLACK McLAREN JONES RYLAND & GRIFFEE, P.C.

_s/ Amy Worrell Sterling_
Michael G. McLaren (#5100)
Amy Worrell Sterling (#25773)
530 Oak Court Drive, Suite 360
Memphis, Tennessee 38117
(901) 762-0535
mmclaren@blackmclaw.com
asterling@blackmclaw.com

*Attorneys for Plaintiff, Memphis Light, Gas and Water Division*